# GARRETT *v.* UNITED STATES

No. 83–1842.   Argued January 16, 1985—Decided June 3, 1985

REHNQUIST, J., delivered the opinion of the Court in which BURGER, C. J., and WHITE, BLACKMUN, and O'CONNOR, JJ., joined.  O'CONNOR, J., filed a concurring opinion, *post*, p. 795.  STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 799. POWELL, J., took no part in the decision of the case.

*Philip A. DeMassa* argued the cause for petitioner.  With him on the briefs was *Richard M. Barnett.*

*Mark I. Levy* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Trott, Deputy Solicitor General Frey,* and *Joel M. Gershowitz.*

JUSTICE REHNQUIST, delivered the opinion of the Court.

This case requires us to examine the double jeopardy implications of a prosecution for engaging in a "continuing criminal enterprise" (CCE), in violation of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U. S. C. § 848, when facts underlying a prior conviction are offered to prove one of three predicate offenses that must be shown to make out a CCE violation. Petitioner Jonathan Garrett contends that his prior conviction is a lesser included offense of the CCE charge, and, therefore, that the CCE prosecution is barred under *Brown* v. *Ohio*, 432 U. S. 161 (1977).

Between 1976 and 1981, Garrett directed an extensive marihuana importation and distribution operation involving off-loading, transporting, and storing boatloads of marihuana. These activities and related meetings and telephone calls occurred in several States, including Arkansas, Florida, Georgia, Louisiana, Massachusetts, Michigan, Texas, and Washington.

In March 1981, Garrett was charged in three substantive counts of an indictment in the Western District of Washington for his role in the off-loading and landing of approximately 12,000 pounds of marihuana from a "mother ship" at Neah Bay, Washington. He was named as a co-conspirator, but not indicted, in a fourth count charging conspiracy to import marihuana. Having learned that he was being investigated on CCE charges in Florida, Garrett moved to consolidate in the Washington proceedings "all charges anticipated, investigated and currently pending against [him]." The Government opposed the motion on the ground that no other charges had then been filed against Garrett, and the District Court denied it.

Garrett pleaded guilty to one count of importation of marihuana in violation of 21 U. S. C. §§ 952, 960(a)(1), 960(b)(2) and 18 U. S. C. § 2. He was sentenced to five years' imprisonment and a $15,000 fine; and the remaining counts against him, including possession of marihuana with intent to distrib-

ute, were dismissed without prejudice to the Government's right to prosecute him on any other offenses he may have committed.

Approximately two months after his guilty plea in Washington, Garrett was indicted in the Northern District of Florida for conspiring to import marihuana, 21 U. S. C. §§ 952, 960, 963, conspiring to possess marihuana with intent to distribute, 21 U. S. C. §§ 841, 846, using a telephone to facilitate illegal drug activities, 21 U. S. C. §§ 963, 846, 843(b), and engaging in a continuing criminal enterprise, 21 U. S. C. § 848. The District Court denied Garrett's pretrial motion to dismiss the CCE charge, made on the ground that it encompassed the Washington importation operation in violation of the Double Jeopardy Clause.

In the Florida trial, the Government introduced extensive evidence of Garrett's ongoing and widespread drug activities, including proof of the marihuana smuggling operation at Neah Bay, Washington. The court instructed the jury on the CCE count that it had to find beyond a reasonable doubt that Garrett had committed "a felony under Title 21 of the United States Code" that "was a part of a continuing series of violations," defined to be "three or more successive violations of Title 21 over a definite period of time with a single or substantially similar purpose." The court further instructed the jury that it had to find that Garrett acted "in concert with five or more other persons," that with respect to them Garrett occupied "a position of organizer, supervisor, or any position of management," and that he "received substantial income from this operation." As to the predicate violations making up the "series," the court instructed the jury that in addition to the offenses charged as substantive counts in the Florida indictment, the felony offenses of possession of marihuana with intent to distribute it, distribution of marihuana, and importation of marihuana would qualify as predicate offenses. 14 Record 16–20. The Washington evidence, as

well as other evidence introduced in the Florida trial, tended to prove these latter three offenses.

The jury convicted Garrett on the CCE count, the two conspiracy counts, and the telephone facilitation count. He received consecutive prison terms totaling 14 years and a $45,000 fine on the latter three counts, and 40 years' imprisonment and a $100,000 fine on the CCE count. The CCE prison term was made concurrent with the prison terms on the other counts, but consecutive to the prison term from the Washington conviction. The CCE fine was in addition to the fine on the other counts and the Washington fine.

On appeal, the Court of Appeals for the Eleventh Circuit rejected Garrett's contention that his conviction in Washington for importing marihuana barred the subsequent prosecution in Florida for engaging in a continuing criminal enterprise. 727 F. 2d 1003 (1984). The court held that the Washington importation offense and the CCE offense were not the same under the Double Jeopardy Clause; hence successive prosecutions and cumulative sentences for these offenses were permissible. We granted certiorari to consider this question. 469 U. S. 814 (1984).

I

This case presents two of the three aspects of the Double Jeopardy Clause identified in *North Carolina* v. *Pearce*, 395 U. S. 711, 717 (1969): protection against a second prosecution for the Washington importation conviction; and protection against multiple punishments for that conviction. Garrett focuses primarily on the former protection, which we address first.

The heart of Garrett's argument entails two steps: First, notwithstanding *Jeffers* v. *United States*, 432 U. S. 137 (1977) (plurality opinion), CCE is a separate substantive offense and not a conspiracy offense because it requires completion of the criminal objective and not merely an agree-

ment.   Thus CCE is not distinct from its underlying predi-
cates in the way that conspiracy is a distinct offense from the
completed object of the conspiracy.   Cf. *Pinkerton* v. *United
States*, 328 U. S. 640, 643 (1946).   Second, applying the test
of *Blockburger* v. *United States*, 284 U. S. 299 (1932), each
of the predicate offenses is the "same" for double jeopardy
purposes as the CCE offense because the predicate offense
does not require proof of any fact not necessary to the CCE
offense.   Because the latter requires proof of additional
facts, including concerted activity with five other persons, a
supervisory role, and substantial income, the predicates are
lesser included offenses of the CCE provision.   The relation-
ship is the same, Garrett argues, as the relationship between
the joyriding and auto theft statutes involved in *Brown* v.
*Ohio*, *supra*, and thus a subsequent prosecution for the
greater CCE offense is barred by the earlier conviction of
the lesser marihuana importation offense.

Where the same conduct violates two statutory provisions,
the first step in the double jeopardy analysis is to determine
whether the legislature—in this case Congress—intended
that each violation be a separate offense.   If Congress in-
tended that there be only one offense—that is, a defendant
could be convicted under either statutory provision for a
single act, but not under both—there would be no statutory
authorization for a subsequent prosecution after conviction
of one of the two provisions, and that would end the double
jeopardy analysis.   Cf. *Albrecht* v. *United States*, 273 U. S.
1, 11 (1927).

This question of legislative intent arose in *Blockburger* in
the context of multiple punishments imposed in a single pros-
ecution.   Based on one drug sale, Blockburger was convicted
of both selling a drug not in the original stamped package and
selling it not in pursuance of a written order of the purchaser.
The sale violated two separate statutory provisions, and the
question was whether "the accused committed two offenses
or only one."   284 U. S., at 303–304.   The rule stated in
*Blockburger* was applied as a rule of statutory construction to

help determine legislative intent. Significantly, after setting out the rule, the Court cited a paragraph in *Albrecht*, *supra*, at 11, which included the following statement: "There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction*" (emphasis added). We have recently indicated that the *Blockburger* rule is not controlling when the legislative intent is clear from the face of the statute or the legislative history. *Missouri* v. *Hunter*, 459 U. S. 359, 368 (1983); *Albernaz* v. *United States*, 450 U. S. 333, 340 (1981); *Whalen* v. *United States*, 445 U. S. 684, 691–692 (1980). Indeed, it would be difficult to contend otherwise without converting what is essentially a factual inquiry as to legislative intent into a conclusive presumption of law.

In the present case the application of the *Blockburger* rule as a conclusive determinant of legislative intent, rather than as a useful canon of statutory construction, would lead to the conclusion urged by Garrett: that Congress intended the conduct at issue to be punishable either as a predicate offense, or as a CCE offense, but not both. The language, structure, and legislative history of the Comprehensive Drug Abuse, Prevention and Control Act of 1970, however, show in the plainest way that Congress intended the CCE provision to be a separate criminal offense which was punishable in addition to, and not as a substitute for, the predicate offenses. Insofar as the question is one of legislative intent, the *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress.

The language of 21 U. S. C. § 848, which is set out in full in the margin,[1] affirmatively states an offense for which punishment will be imposed. It begins:

---

[1] "§ 848. Continuing criminal enterprise

"(a) Penalties; forfeitures

"(1) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years

"Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be

and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2); except that if any person engages in such activity after one or more prior convictions of him under this section have become final, he shall be sentenced to a term of imprisonment which may not be less than 20 years and which may be up to life imprisonment, to a fine of not more than $200,000, and to the forfeiture prescribed in paragraph (2).

"(2) Any person who is convicted under paragraph (1) of engaging in a continuing criminal enterprise shall forfeit to the United States—

"(A) the profits obtained by him in such enterprise, and

"(B) any of his interest in, claim against, or property or contractual rights of any kind affording a source of influence over, such enterprise.

"(b) 'Continuing criminal enterprise' defined

"For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

"(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

"(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

"(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

"(B) from which such person obtains substantial income or resources.

"(c) Suspension of sentence and probation prohibited

"In the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and section 4202 of title 18 and the Act of July 15, 1932 (D. C. Code, secs. 24–203—24–207), shall not apply.

"(d) Jurisdiction of courts

"The district courts of the United States (including courts in the territories or possessions of the United States having jurisdiction under subsection (a) of this section) shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as they shall deem proper."

up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2)." § 848(a)(1).

At this point there is no reference to other statutory offenses, and a separate penalty is set out, rather than a multiplier of the penalty established for some other offense. This same paragraph then incorporates its own recidivist provision, providing for twice the penalty for repeat violators of this section. Significantly the language expressly refers to "one or more prior *convictions . . . under this section.*" Next, subparagraph (2), which sets out various forfeiture provisions, also refers to any person "who is *convicted* under paragraph (1) of engaging in a continuing criminal enterprise," again suggesting that § 848 is a distinct offense for which one is separately convicted.

Subsection (b) of § 848 defines the conduct that constitutes being "engaged in a continuing criminal enterprise":

"(1) he violates any provision of this subchapter or subchapter II of this chapter [establishing various drug offenses] the punishment for which is a felony, and

"(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

"(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

"(B) from which such person obtains substantial income or resources."

A common-sense reading of this definition reveals a carefully crafted prohibition aimed at a special problem. This language is designed to reach the "top brass" in the drug rings, not the lieutenants and foot soldiers.

The definition of a continuing criminal enterprise is not drafted in the way that a recidivist provision would be

drafted. Indeed § 848(a)(1), as already noted, contains language that is typical of that sort of provision. Moreover, the very next section of the statute entitled "Dangerous Special Drug Offender Sentencing" is a recidivist provision. It is drafted in starkly contrasting language which plainly is not intended to create a separate offense. For example, it provides for a special hearing before the court sitting without a jury to consider the evidence of prior offenses, and the determination that a defendant is a dangerous special drug offender is made on a preponderance of the information by the court. See 21 U. S. C. § 849.

This conclusion as to Congress' intent is fortified by the legislative history. H. R. 18583 is the bill that was enacted to become the Comprehensive Drug Abuse Prevention and Control Act of 1970. In its section-by-section analysis, the House Committee Report states:

> "Section 408(a) [21 U. S. C. § 848(a)] provides that any person who engages in a continuing criminal enterprise shall upon *conviction* for that *offense* be sentenced to a term of imprisonment for not less than 10 years and up to life . . . . If the person engages in this activity subsequent to one or more *convictions under this section*, he shall receive a penalty of not less than 20 years' imprisonment . . . ." H. R. Rep. No. 91–1444, pt. 1, p. 50 (1970) (emphasis added).

The intent to create a separate offense could hardly be clearer.

As originally introduced in the House, H. R. 18583 had a section entitled "Continuing Criminal Enterprises" which in reality was a recidivist provision, like the current 21 U. S. C. § 849, that provided for enhanced sentences for "a special offender," who "committed [a drug] felony as part of a pattern of conduct which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise." The House Committee substituted for this provision

an amendment offered by Representative Dingell that ultimately became the current § 848. "Instead of providing a post-conviction-presentencing procedure, [the Dingell amendment] made engagement in a continuing criminal enterprise a new and distinct offense with all its elements triable in court." H. R. Rep. No. 91–1444, pt. 1, pp. 83–84 (1970) (additional views); see 116 Cong. Rec. 33302 (1970) (remarks of Rep. Eckhardt).

During consideration of the bill by the full House, Representative Poff offered an amendment which would restore the recidivist provision to the bill in addition to the Dingell provision. Explaining the differences between the two approaches, Representative Eckhardt stated:

> "[T]he Dingell amendment created a new offense which would have to be triable in all its parts by admissible evidence brought before the court, whereas the post-conviction presentence [procedure] of the original bill similar to the Poff provisions provided that some report upon which sentence would be based would be available to the judge, cross-examination would be available of those who presented the report, but not of those who may have contributed to it." *Ibid.*

Later in the debate, Representative Poff explained his proposed amendment further:

> "Mr. Chairman, the most dangerous criminal in the criminal drug field is the organized crime offender, the habitual offender, the professional criminal.
>
> "Mr. Chairman, we need special penalties in my opinion for these special criminals. Constitutional scholars have suggested two approaches to deal with such offenders. The first is the creation of a separate crime with separate penalties. The second approach is the imposition of longer sentences upon those convicted first of the basic crime and then shown to be dangerous offenders.
>
> "Mr. Chairman, the first approach, the separate crime approach, is the approach taken by section 408 of the

Committee bill [21 U. S. C. § 848]. The second is found in the amendment which I have just offered which adds two new sections to the bill, sections 409 and 410 [21 U. S. C. §§ 849 and 850]." *Id.*, at 33630.

The distinction between the two approaches was emphasized in the continuing debate. For example, Representative Eckhardt stated: "Under the Dingell amendment, if you are going to prove a man guilty, you have to come into court and prove every element of the continuing criminal offense." Representative Poff concurred in this characterization of the CCE provision "which embodies a new separate criminal offense with a separate criminal penalty." Representative Poff distinguished this approach from his proposed amendment which "authorizes the judge to impose the extended sentence upon the defendant in the dock who has already been found guilty by the jury of the basic charge." *Id.*, at 33631. The Poff amendment was adopted, *id.*, at 33634, and both approaches are contained in the statute, 21 U. S. C. §§ 848, 849, and 850.

In view of this legislative history, it is indisputable that Congress intended to create a separate CCE offense. One could still argue, however, that having created the separate offense, Congress intended it, where applicable, to be a substitute for the predicate offenses. Nowhere in the legislative history is it stated that a big-time drug operator could be prosecuted and convicted for the separate predicate offenses as well as the CCE offense. The absence of such a statement, however, is not surprising; given the motivation behind the legislation and the temper of the debate, such a statement would merely have stated the obvious. Congress was seeking to add a new enforcement tool to the substantive drug offenses already available to prosecutors. During the debate on the Poff amendment, for example, Representative Fascell stated: "I see no reason to treat a drug trafficker any less harshly than an organized crime racketeer. Their acts are equally heinous, the consequences equally severe,

and their punishment equally justified." Representative Weicker stated: "The penalty structure has been designed to accommodate all types of drug offenders, from the casual drug user and experimenter to the organized crime syndicates engaged in unlawful transportation and distribution of illicit drugs." He continued, "This bill goes further in providing those persons charged with enforcing it a wide variety of enforcement tools which will enable them to more effectively combat the illicit drug trafficker and meet the increased demands we have imposed on them." Representative Taft stated: "[T]his amendment will do much at least to help a coordinated attack on the organized crime problem within the purview of this legislation. . . . Hopefully, we will see other legislation coming along broadening the attack on the crime syndicates even further." 116 Cong. Rec. 33630–33631 (1970). It runs counter to common sense to infer from comments such as these, which pervade the entire debate and which stand unrebutted, that Congress intended to substitute the CCE offense for the underlying predicate offenses in the case of a big-time drug dealer rather than to permit prosecution for CCE in addition to prosecution for the predicate offenses.

Finally, it would be illogical for Congress to intend that a choice be made between the predicate offenses and the CCE offense in pursuing major drug dealers. While in the instant case Garrett claims that the Government was aware of the possibility of bringing the CCE charge before he was indicted on the Washington offenses, in many cases the Government would catch a drug dealer for one offense before it was aware of or had the evidence to make a case for other drug offenses he had committed or in the future would commit. The Government would then be forced to choose between prosecuting the dealer on the offense of which it could prove him guilty or releasing him with the idea that he would continue his drug-dealing activities so that the Government might catch him twice more and then be able to prosecute him on the CCE

offense. Such a situation is absurd and clearly not what Congress intended.

## II

Having determined that Congress intended CCE to be a separate offense and that it intended to permit prosecution for both the predicate offenses and the CCE offense, we must now determine whether prosecution for a CCE offense after an earlier prosecution for a predicate offense is constitutional under the Double Jeopardy Clause of the Fifth Amendment. The Double Jeopardy Clause provides:

> "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb."

The critical inquiry is whether a CCE offense is considered the "same offense" as one or more of its predicate offenses within the meaning of the Double Jeopardy Clause.

Quite obviously the CCE offense is not, in any common-sense or literal meaning of the term, the "same" offense as one of the predicate offenses. The CCE offense requires the jury to find that the defendant committed a predicate offense, and in addition that the predicate offense was part of a continuing series of predicate offenses undertaken by the defendant in concert with five or more other persons, that the defendant occupied the position of an organizer or manager, and that the defendant obtained substantial income or resources from the continuing series of violations.

In order to properly analyze the successive prosecution issue, we must examine not only the statute which Congress has enacted, but also the charges which form the basis of the Government's prosecution here. Petitioner pleaded guilty in the Western District of Washington in May 1981 to a count charging importation of 12,000 pounds of marihuana at Neah Bay, Washington, on August 26, 1980. He was indicted in the Northern District of Florida in July 1981, on charges of conspiring to import "multi-ton quantities of marihuana and marihuana 'Thai sticks'" from January 1976 to July 16, 1981;

of conspiring to possess with intent to distribute marihuana over the same period of time; and of engaging in a continuing criminal enterprise over the same period of time. Thus at the very moment he made his motion to require "consolidation" of all the charges against him in the Western District of Washington, he was engaging in criminal conduct of which he was later found guilty by a jury in the Northern District of Florida.

Petitioner contends that the marihuana importation charge to which he pleaded guilty in Washington was a "lesser included offense" of the CCE offense of which he was convicted in Florida. He points out that evidence of the Washington offense was introduced at the Florida trial, and that the jury was permitted to find that the Washington violation was one of the "predicate offenses" for the CCE charge in Florida. He relies on *Brown* v. *Ohio*, 432 U. S. 161 (1977), for his conclusion that the use of the Washington offense as an element of the Florida charge placed him twice in jeopardy in violation of the Fifth Amendment to the United States Constitution.

*Brown* v. *Ohio* held that, where the misdemeanor of joyriding was a lesser included offense in the felony of auto theft, a prosecution for the misdemeanor barred a second prosecution for the felony. We think there is a good deal of difference between the classic relation of the "lesser included offense" to the greater offense presented in *Brown*, on the one hand, and the relationship between the Washington marihuana offense and the CCE charge involved in this case, on the other. The defendant in *Brown* had stolen an automobile and driven it for several days. He had engaged in a single course of conduct—driving a stolen car. The very same conduct would support a misdemeanor prosecution for joyriding or a felony prosecution for auto theft, depending only on the defendant's state of mind while he engaged in the conduct in question. Every moment of his conduct was as relevant to the joyriding charge as it was to the auto theft charge.

In the case before us the situation is quite different. The count in the Washington indictment to which Garrett pleaded guilty charged importation of 12,000 pounds of marihuana at Neah Bay on August 26, 1980. The Washington indictment was returned on March 17, 1981, and a guilty plea entered on May 18, 1981. Two other counts of the indictment, including causing interstate travel to facilitate importation of marihuana on or about October 24, 1979, were dismissed without prejudice to the Government's right subsequently to prosecute any other offense Garrett may have committed.

The CCE indictment returned against Garrett in Florida was returned on July 16, 1981. It charged that he had, from January 1976, "up to and including [July 16, 1981]," conspired in that district and "divers other districts" to import multiton quantities of marihuana and marihuana "Thai sticks" in violation of applicable federal law. Another count charged conspiracy to possess with intent to distribute marihuana over the same period of more than five years. A third count of the Florida indictment charged that Garrett had engaged in the Northern District of Florida and in "divers other districts" in a continuing criminal enterprise over the same 5½-year period.

Obviously the conduct in which Garrett was charged with engaging in the Florida indictment, when compared with that with which he was charged in the Washington indictment, does not lend itself to the simple analogy of a single course of conduct—stealing a car—comprising a lesser included misdemeanor within a felony. Here the continuing criminal enterprise was alleged to have spanned more than five years; the acts charged in the Washington indictment were alleged to have occurred on single days in 1979 and 1980, respectively. Whenever it was during the 5½-year period alleged in the indictment that Garrett committed the first of the three predicate offenses required to form the basis for a CCE prosecution, it could not then have been said with any certainty that he would necessarily go ahead and commit the

other violations required to render him liable on a CCE charge. Every minute that Nathaniel Brown drove or possessed the stolen automobile he was simultaneously committing both the lesser included misdemeanor and the greater felony, but the same simply is not true of Garrett. His various boatload smuggling operations in Louisiana, for example, obviously involved incidents of conduct wholly separate from his "mother boat" operations in Washington. These significant differences caution against ready transposition of the "lesser included offense" principles of double jeopardy from the classically simple situation presented in *Brown* to the multilayered conduct, both as to time and to place, involved in this case.

Were we to sustain Garrett's claim, the Government would have been able to proceed against him in either one of only two ways. It would have to have withheld the Washington charges, alleging crimes committed in October 1979 and August 1980, from the grand jury which indicted Garrett in March 1981, until it was prepared to present to a grand jury the CCE charge which was alleged to have been, and found by a jury to be, continuing on each of those dates; or it would have to have submitted the CCE charge to the Washington grand jury in March 1981, even though the indictment ultimately returned against Garrett on that charge alleged that the enterprise had continued until July 1981.[2] We do not

---

[2] JUSTICE STEVENS in dissent argues that, although the Neah Bay prosecution in Washington does not bar Garrett's later prosecution for a CCE that ended before the Neah Bay importation took place, none of the evidence pertaining to the latter crime could be used consistently with the Double Jeopardy Clause to show a CCE. While it may be true that with the benefit of hindsight the Government could have indicted and the jury convicted for a CCE that began in December 1976, and continued until October 1979, that is not the crime which the indictment charged nor for which the jury convicted. The Government indicted for a CCE beginning in 1976 and continuing through July 1981, months after the Neah Bay indictment had been returned. Nothing in the record indicates that the Government's inclusion of the months following the Neah Bay indictment

think that the Double Jeopardy Clause may be employed to force the Government's hand in this manner, however we were to resolve Garrett's lesser-included-offense argument. One who insists that the music stop and the piper be paid at a particular point must at least have stopped dancing himself before he may seek such an accounting.

Petitioner urges that "[w]here the charges arise from a single criminal act, occurrence, episode, or transaction, they must be tried in a single proceeding. *Brown* v. *Ohio*, 432 U. S., at 170 (BRENNAN, J., concurring)." We have steadfastly refused to adopt the "single transaction" view of the Double Jeopardy Clause. But it would seem to strain even that doctrine to describe Garrett's multifarious multistate activities as a "single transaction." For the reasons previously stated, we also have serious doubts as to whether the offense to which Garrett pleaded guilty in Washington was a "lesser included offense" within the CCE charge so that the prosecution of the former would bar a prosecution of the latter. But we may assume, for purposes of decision here, that the Washington offense was a lesser included offense, because in our view Garrett's claim of double jeopardy would still not be sustainable.

---

within the time of the CCE charge was unsupported by the evidence which would be adduced, and therefore merely an artificial attempt by the Government to extend the time period covered by the indictment to avoid a double jeopardy claim.

The Government, and not the courts, is responsible for initiating a criminal prosecution, and subject to applicable constitutional limitations it is entitled to choose those offenses for which it wishes to indict and the evidence upon which it wishes to base the prosecution. Whether or not JUSTICE STEVENS is correct in asserting that the Neah Bay charge was not necessary to establish one of the three predicate offenses for a CCE charge, the Government obviously viewed the matter differently. We think that for the reasons stated in the text at 786–793, the Double Jeopardy Clause does not require the Government to dispense with the use of the Neah Bay operation as a predicate offense in the CCE prosecution in Florida.

In *Diaz* v. *United States*, 223 U. S. 442 (1912), the Court had before it an initial prosecution for assault and battery, followed by a prosecution for homicide when the victim eventually died from injuries inflicted in the course of the assault. The Court rejected the defendant's claim of double jeopardy, holding that the two were not the "same offense":

> "The homicide charged against the accused in the Court of First Instance and the assault and battery for which he was tried before the justice of the peace, although identical in some of their elements, were distinct offenses both in law and in fact. The death of the injured person was the principal element of the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. Then, and not before, was it possible to put the accused in jeopardy for that offense." *Id.*, at 448–449.

In the present case, as in *Diaz*, the continuing criminal enterprise charged against Garrett in Florida had not been completed at the time that he was indicted in Washington. The latter event took place in March 1981, whereas the continuing criminal enterprise charged in the Florida indictment and found by the trial jury extended from January 1976 to July 1981. The evidence at trial showed, for example, that Garrett was arrested for traffic offenses and other violations on July 23, 1981, while out on bail pending sentencing for the Washington conviction. He told the arresting officer that the officer had caught "somebody big" and that he was a "smuggler." At the time of the arrest, Garrett was carrying $6,253 in cash. About $30 of this was in quarters. He explained that he needed them to make long-distance phone calls, on which he sometimes spent $25 to $50 a day. He also told the arresting officer and a federal agent who interviewed him the next morning that he had just bought the truck he

had been driving for $13,000 cash and that he used it for smuggling. He further stated that he had a yacht in Hawaii which he had purchased for $160,000 cash. This evidence is consistent with the jury's verdict that Garrett continued his CCE activities into July 1981.

We think this evidence not only permits but requires the conclusion that the CCE charged in Florida, alleged to have begun in January 1976, and continued up to mid-July 1981, was under *Diaz* a different offense from that charged in the Washington indictment. We cannot tell, without considerable sifting of the evidence and speculating as to what juries might do, whether the Government could in March 1981 have successfully indicted and prosecuted Garrett for a different continuing criminal enterprise—one ending in March 1981. But we do not think any such sifting or speculation is required at the behest of one who at the time the first indictment is returned is continuing to engage in other conduct found criminal by the jury which tried the second indictment.

It may well be, as JUSTICE STEVENS suggests in his dissenting opinion, that the Florida indictment did not by its terms indicate that the Neah Bay importation would be used as evidence to support it, *post*, at 804–805, and therefore at the time the pretrial motion to dismiss on double jeopardy grounds was made the District Court in Florida could not have rendered an informed decision on petitioner's motion. But there can be no doubt that by the time the evidence had all been presented in the Florida trial, and the jury was charged, only one reasonable conclusion could be drawn by the District Court: the Government's evidence with respect to the CCE charge included acts which took place after March 1981, the date of the Washington indictment, and up to and including July 1981. Therefore, the continuing criminal enterprise charged by the Government had not been completed at the time the Washington indictment was returned, and under the *Diaz* rule evidence of the Neah

Bay importation might be used to show one of the predicate offenses.[3]

Having concluded that Congress intended CCE to be a separate offense and that it does not violate the Double Jeopardy Clause under the facts of this case to prosecute the CCE offense after a prior conviction for one of the predicate offenses, the only remaining issue is whether the Double Jeopardy Clause bars cumulative punishments. Garrett's sentence on the CCE conviction was consecutive to his sentence on the Washington conviction. In this connection, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri* v. *Hunter*, 459 U. S., at 366; *Albernaz* v. *United States*, 450 U. S., at 344. As discussed above, Congress intended to create a separate offense. The presumption when Congress creates two distinct offenses is that it intends to permit cumulative sentences, and legislative silence on this specific issue does not establish an ambiguity or rebut this presumption:

> "[The defendants] read much into nothing. Congress cannot be expected to specifically address each issue of statutory construction which may arise. But, as we have previously noted, Congress is 'predominantly a lawyer's body,' . . . and it is appropriate for us 'to assume that our elected representatives . . . know the law.' . . . As a result if anything is to be assumed from the congressional silence on this point, it is that Congress was aware of the *Blockburger* rule and legislated with it in mind. It is not a function of this Court to presume that

---

[3] The Government argues as an alternative basis for sustaining successive prosecutions of the predicate offense and the CCE offense that the CCE offense can be likened to a recidivist statute. See *Graham* v. *West Virginia*, 224 U. S. 616 (1912), and *Oyler* v. *Boles*, 368 U. S. 448 (1962). Because of our disposition of the case, we have no need to consider this submission.

'Congress was unaware of what it accomplished.'" *Id.,* at 341–342.

Here, of course, Congress was not silent as to its intent to create separate offenses notwithstanding *Blockburger,* and we can assume it was aware that doing so would authorize cumulative punishments absent some indication of contrary intent.

Moreover, disallowing cumulative sentences would have the anomalous effect in many cases of converting the large fines provided by § 848 into ceilings. Congress established the large fines in § 848 in an effort to deprive big-time drug dealers of some of their enormous profits, which often cannot be traced directly to their crimes for forfeiture purposes. The fines for a three-time offender who has been previously convicted of a drug felony could amount to $150,000 for the predicate offenses standing alone—an amount that exceeds the ceiling for a first-time CCE fine. Compare § 841(b)(1)(A) with § 848(a)(1). Congress was bent on depriving the big-time drug dealer of his profits; it is doubtful that Congress intended to force an election of a lower maximum fine in such a situation in order to attempt to obtain the life imprisonment penalty available under the CCE provision.

In *Jeffers* v. *United States,* 432 U. S., at 156–157, a plurality of this Court stated that § 848 "reflects a comprehensive penalty structure that leaves little opportunity for pyramiding of penalties from other sections of the Comprehensive Drug Abuse Prevention and Control Act of 1970." The focus of the analysis in *Jeffers* was the permissibility of cumulative punishments for conspiracy under § 846 and for CCE under § 848, and the plurality reasonably concluded that the dangers posed by a conspiracy and a CCE were similar and thus there would be little purpose in cumulating the penalties. The same is not true of the substantive offenses created by the Act and conspiracy, and by the same logic, it is not true of the substantive offenses and CCE. We have been required in the present case, as we were not in *Jeffers,* to consider the relationship between substantive predicate offenses and a

CCE. We think here logic supports the conclusion, also indicated by the legislative history, that Congress intended separate punishments for the underlying substantive predicates and for the CCE offense. Congress may, of course, so provide if it wishes.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE O'CONNOR, concurring.

I agree that, on the facts of this case, the Double Jeopardy Clause does not bar prosecution and sentencing under 21 U. S. C. § 848 for engaging in a continuing criminal enterprise even though Garrett pleaded guilty to one of the predicate offenses in an earlier prosecution. This conclusion is admittedly in tension with certain language in prior opinions of the Court. *E. g., Brown* v. *Ohio,* 432 U. S. 161, 166 (1977). I write separately to explain why I believe that today's holding comports with the fundamental purpose of the Double Jeopardy Clause and with the method of analysis used in our more recent decisions.

The Double Jeopardy Clause declares: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ." U. S. Const., Amdt. 5. This constitutional proscription serves primarily to preserve the finality of judgments in criminal prosecutions and to protect the defendant from prosecutorial overreaching. See, *e. g., Ohio* v. *Johnson,* 467 U. S. 493, 498–499 (1984); *United States* v. *DiFrancesco,* 449 U. S. 117, 128, 136 (1980). In *Green* v. *United States,* 355 U. S. 184 (1957), the Court explained:

"The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him

to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Id.*, at 187–188.

Decisions by this Court have consistently recognized that the finality guaranteed by the Double Jeopardy Clause is not absolute, but instead must accommodate the societal interest in prosecuting and convicting those who violate the law. *Tibbs* v. *Florida*, 457 U. S. 31, 40 (1982); *United States* v. *Tateo*, 377 U. S. 463, 466 (1964). The Court accordingly has held that a defendant who successfully appeals a conviction generally is subject to retrial. *Tibbs, supra*, at 40. Similarly, double jeopardy poses no bar to another trial where a judge declares a mistrial because of "manifest necessity." *Illinois* v. *Somerville*, 410 U. S. 458 (1973). Such decisions indicate that absent "governmental oppression of the sort against which the Double Jeopardy Clause was intended to protect," *United States* v. *Scott*, 437 U. S. 82, 91 (1978), the compelling public interest in punishing crimes can outweigh the interest of the defendant in having his culpability conclusively resolved in one proceeding. *Tibbs, supra*, at 41–44.

*Brown* v. *Ohio, supra*, held that the Double Jeopardy Clause prohibits prosecution of a defendant for a greater offense when he has already been tried and acquitted or convicted on a lesser included offense. *Id.*, at 168–169. The concerns for finality that support this conclusion, however, are no more absolute than those involved in other contexts. See *Jeffers* v. *United States*, 432 U. S. 137, 152 (1977) (plurality opinion). Instead, successive prosecution on a greater offense may be permitted where justified by the public interest in law enforcement and the absence of prosecutorial overreaching. For example, in *Diaz* v. *United States*, 223 U. S. 442, 449 (1912), the Court found no double jeopardy bar to a prosecution for murder where the victim of an assault died after the defendant's trial for assault and battery. *Diaz* implies that prosecution for a lesser offense does not prevent subsequent prosecution for a greater offense where the latter

depends on facts occurring after the first trial. Dicta in *Brown* v. *Ohio* suggested that the same conclusion would apply where the later prosecution rests on facts that the government could not have discovered earlier through due diligence. 432 U. S., at 169, n. 7. See also *Jeffers* v. *United States, supra,* at 151–152.

Application of the rule of *Brown* v. *Ohio* is also affected by the actions of the defendant himself. In *Jeffers* v. *United States, supra,* the plurality opinion rejected a claim of double jeopardy where prosecution for a greater offense followed a guilty verdict for a lesser offense, and the successive prosecution resulted from the defendant's opposition to consolidated trials. *Id.,* at 152–154. Last Term, the Court relied on *Jeffers* to hold that where a court accepts, over the prosecution's objection, a defendant's guilty plea to lesser included offenses, double jeopardy does not prevent further prosecution on remaining, greater offenses. *Ohio* v. *Johnson, supra,* at 501–502. After noting the State's interest in convicting those who have violated its laws and the absence of governmental overreaching, *Johnson* observed that the defendant "should not be entitled to use the Double Jeopardy Clause as a sword to prevent the State from completing its prosecution on the remaining charges." 467 U. S., at 502.

Turning to the circumstances of this case, I conclude that Garrett cannot validly argue that the Government is prevented from using evidence relating to his May 1981 conviction to prove his participation in a continuing criminal enterprise from January 1976 through July 1981. I am willing to assume, *arguendo,* that the 1981 conviction for importation of marihuana is a lesser included offense of the charges for violating 18 U. S. C. § 848. As noted *ante,* at 788, 791–793, the Government both alleged and presented evidence that Garrett's violation of § 848 continued after the conviction on the lesser included offense. Although the Government alleged participation in the unlawful continuing enterprise through July 1981, none of the events occurring after the date of the earlier prosecution were essential elements to

prove a violation of § 848. Thus, this case falls somewhere between *Diaz* and *Brown* v. *Ohio*. The dissent reads the latter decision as limiting application of *Diaz* to circumstances where the facts *necessary* to the greater offense occur or are discovered after the first prosecution. *Post,* at 806–807. Although I find merit to this position, I reach a different conclusion upon balancing the interests protected by the Double Jeopardy Clause.

The approach advocated by the dissent would effectively force the Government's hand with respect to prosecution under § 848. Under that approach, once the Government believes that facts sufficient to prove a continuing criminal enterprise exist, it can either bring charges under § 848 or seek conviction only for a predicate offense while forgoing its later use to prove a continuing violation of § 848. The decision to bring charges under § 848, however, will necessarily and appropriately depend on prosecutorial judgments concerning the adequacy of the evidence, the efficient allocation of enforcement resources, and the desirability of seeking the statute's severe sanctions. These considerations may be affected by events occurring after the last necessary predicate offense. Where the defendant continues unlawful conduct after the time the Government prosecutes him for a predicate offense, I do not think he can later contend that the Government is foreclosed from using that offense in another prosecution to prove the continuing violation of § 848. Cf. *Jeffers, supra,* at 154. As the Court noted in another context, "the Double Jeopardy Clause, which guards against Government oppression, does not relieve a defendant from the consequences of his voluntary choice." *United States* v. *Scott, supra,* at 99.

The Court's holding does not leave the defendant unduly exposed to oppressive tactics by the Government. Any acquittal on a predicate offense would of course bar the Government from later attempting to relitigate issues in a prosecution under § 848. *Ashe* v. *Swenson,* 397 U. S. 436 (1970).

This fact will prevent the Government from "treat[ing] the first trial as no more than a dry run for the second prosecution," *id.*, at 447. Moreover, I note that we do not decide in this case whether a defendant would have a valid double jeopardy claim if the Government failed in a later prosecution to allege and to present evidence of a continuing violation of § 848 after an earlier conviction for a predicate offense. Certainly the defendant's interest in finality would be more compelling where there is no indication of continuing wrongdoing after the first prosecution.

For the reasons stated, I agree that under the circumstances of this case the Double Jeopardy Clause does not bar Garrett's prosecution under § 848. Because I also agree that Congress intended to authorize separate punishment for the underlying predicate offenses and the violation of § 848, I join the opinion of the Court.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

While I agree with the Court that petitioner's conviction for importing 12,000 pounds of marihuana into Neah Bay, Washington, on August 26, 1980, does not bar his prosecution for a continuing criminal enterprise that began in December 1976, and continued into October 1979, I do not agree with the Court's analysis of the double jeopardy implications of the first conviction or with its decision to affirm the judgment of the Court of Appeals. In my opinion, the separate indictment, conviction, and sentencing for the Neah Bay transaction make it constitutionally impermissible to use that transaction as one of the predicate offenses needed to establish a continuing criminal enterprise in a subsequent prosecution under 21 U. S. C. § 848.

In order to explain my position, I shall first emphasize the difference between the Washington and the Florida proceedings and the limited extent of their overlap, then identify the relevant constraint that is imposed by the Double Jeopardy Clause, and finally note the flaw in the Court's analysis.

# I

The Washington and Florida indictments were returned within three months of each other; they focus on two sets of transactions that occurred in almost mutually exclusive time periods. The fact that the later Florida indictment deals with the earlier series of events is a source of some confusion that, I believe, can be put to one side if we begin by describing the Florida indictment—the one that gave rise to the case we are now reviewing.

## The Florida Indictment

On July 16, 1981, a grand jury in the Northern District of Florida returned an 11-count indictment against petitioner and five other defendants.[1] Petitioner was named as a defendant in seven counts, four of which refer to the use of a telephone on a specific date in 1978 or 1979. The three counts relevant to the present issue charged petitioner with conspiracy to import marihuana (Counts I and II) and with conducting a continuing criminal enterprise (Count XI) in violation of 21 U. S. C. § 848.[2]

The contours of the prosecution's case are suggested by the 34 overt acts alleged in Count I as having been performed by the six defendants and five named co-conspirators.[3] Each of the first 33 overt acts was alleged to have occurred in the period between December 1976 and August 1979; the 34th occurred on October 25, 1979. The three principal transactions involved (1) the unloading of about 30,000 pounds of marihuana from the vessel *Buck Lee* at Fourchan Land-

---

[1] The six defendants were Jonathan Garrett, Robert Hoskins, Christopher Garrett, Donald McMichaels, Caesar Garcia, Sr., a/k/a Papasan, and Norman Vick. App. 56.

[2] *Id.*, at 55–65. Count I alleged violations of 21 U. S. C. §§ 952, 960 and 963; Count II alleged violations of 21 U. S. C. §§ 841 and 846.

[3] The five named co-conspirators were Jack Nichols, Thomas Ruth, Robert Gorman, Doug Hoskins, and Joe Knowles. App. 58–62.

ing, Louisiana, in December 1976; (2) the arrival of the vessel *Mr. Frank* with a multiton load of marihuana at a boatyard near Crown Point, Louisiana, in June 1977; and (3) the voyage of the vessel *Morning Star* from Mobile, Alabama, to Santa Marta, Colombia, to pick up 28,145 pounds of marihuana in June 1979.[4] Notably, although each of the three principal transactions would obviously have supported a substantive charge of importation in violation of 21 U. S. C. § 812 and § 952, no such charge was made against petitioner. Instead, Count XI charged that he had engaged in a continuing criminal enterprise (CCE) in violation of 21 U. S. C. § 848 "from in or about the month of January, 1976, and continuing thereafter up to and including the date of the filing of this indictment."[5]

*The Washington Indictment*

On March 17, 1981, a grand jury in the Western District of Washington returned a four-count indictment against petitioner and three other defendants.[6] None of these codefendants was named as a defendant in the Florida indictment.[7] Count I alleged a conspiracy beginning in or about September 1979 and continuing through August 26, 1980, to import 12,000 pounds of marihuana. The 15 alleged overt acts all occurred between September 1979 and October 1980, and all related to the unloading of 12,000 pounds of marihuana from a "mother ship" to fishing vessels in Neah Bay, Washington.[8] In addition to the conspiracy count, the

---

[4] *Id.*, at 58–61.

[5] *Id.*, at 64.

[6] The three other defendants were Robert Gorman, Don DePoe and Michael Johnson a/k/a Michael Minikin. *Id.*, at 3.

[7] Robert Gorman, who is referred to in the briefs as a "cooperating defendant," was however named as a co-conspirator in the Florida indictment. *Id.*, at 59. Moreover, Joseph Knowles, who apparently was an informer, was named as a co-conspirator in both cases. *Id.*, at 4, 59.

[8] *Id.*, at 3–5.

indictment also contained three substantive counts, but it did not make a CCE charge.[9]

There is some overlap between the Florida and the Washington indictments. The 34th overt act alleged in the Florida indictment was a meeting in Bellevue, Washington, on October 25, 1979, to discuss plans to import a shipload of marihuana.[10] The first three overt acts in the Washington indictment refer to activities in Bellevue, Washington, in September and October 1979, which apparently related to the Neah Bay landing in August of the following year.[11] Moreover, the final allegation in Count XI of the Florida indictment refers to the yacht *Sun Chaser III*, which apparently was the "mother ship" in the Neah Bay incident.[12]

Thus, the two indictments appear to identify a series of four major importations in four different vessels over a 4-year period. The first three, together with the initial planning of the fourth, are plainly adequate to constitute a CCE. The question in the case, therefore, is whether the conviction on the fourth transaction, at Neah Bay—which occurred before the Florida case went to trial—makes it impermissible to use that transaction as a predicate offense to establish the CCE violation in the later prosecution.

## II

Proper analysis of the double jeopardy implications of petitioner's conviction for importing marihuana into Neah Bay, Washington, in August 1980 requires consideration not only of the general rule prohibiting successive prosecutions for greater and lesser offenses but also of an exception that may apply when the lesser offense is first prosecuted. The general rule is easily stated. The "Double Jeopardy Clause prohibits a State or the Federal Government from trying a

---

[9] *Id.*, at 6–7.

[10] *Id.*, at 62.

[11] *Id.*, at 4.

[12] *Id.*, at 65.

defendant for a greater offense after it has convicted him of a lesser included offense."[13]   This rule applies to "complex statutory crimes."[14]   The CCE offense proscribed by § 848 is clearly such a crime.

In *Brown* v. *Ohio*, 432 U. S. 161 (1977), after making a full statement of the general rule,[15] we noted the exception that may preserve the government's right to prosecute for a greater offense after a prosecution for a lesser offense.   We stated:

> "An exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have

---

[13] *Jeffers* v. *United States*, 432 U. S. 137, 150 (1977) (opinion of BLACK-MUN, J.).

[14] *Id.*, at 151.

[15] The Court wrote:

"The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it.

"This conclusion merely restates what has been this Court's understanding of the Double Jeopardy Clause at least since *In re Nielsen* was decided in 1889.   In that case the Court endorsed the rule that

'where . . . a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offense.' 131 U. S., at 188.

"Although in this formulation the conviction of the greater precedes the conviction of the lesser, the opinion makes it clear that the sequence is immaterial.   Thus, the Court treated the formulation as just one application of the rule that two offenses are the same unless each requires proof that the other does not.   *Id.*, at 188, 190, citing *Morey* v. *Commonwealth*, [108 Mass.], at 434.   And as another application of the same rule, the Court cited, 131 U. S., at 190, with approval the decision of *State* v. *Cooper*, 13 N. J. L. 361 (1833), where the New Jersey Supreme Court held that a conviction for arson barred a subsequent felony-murder indictment based on the death of a man killed in the fire.   Cf. *Waller* v. *Florida*, 397 U. S. 387, 390 (1970).   Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."   432 U. S., at 168–169 (footnote omitted).

not occurred or have not been discovered despite the exercise of due diligence. See *Diaz* v. *United States,* 223 U. S. 442, 448–449 (1912); *Ashe* v. *Swenson,* [397 U. S.], at 453 n. 7 (BRENNAN, J., concurring)."[16]

The fact that the general rule and the exception may be easily stated does not mean that either may be easily applied to this case. The problem may, however, be clarified by a somewhat oversimplified statement of the elements of the CCE offense. It, of course, requires that the defendant be a manager, organizer, or supervisor of the enterprise, that he act in concert with at least five other persons, and that he obtain substantial income from it.[17] The most important requirement for present purposes, however, is that he must commit a felony as "a part of a continuing series of violations of this subchapter . . . ."[18] I assume that the words "continuing series" contemplate at least three successive felony violations, but of course the series could involve more.[19]

Thus, if we view the entire course of petitioner's conduct as alleged in both indictments, it would appear that the Government could have alleged that all four importations constituted proof of a single CCE. Moreover, even though the prosecutor was clearly aware of the fourth importation when the Florida indictment was returned, I see no reason why he could not properly establish a CCE violation based on only the first three importations.[20] As written, the Florida indict-

---

[16] *Id.,* at 169, n. 7.

[17] *Jeffers* v. *United States,* 432 U. S., at 141–142.

[18] See *ante,* at 780, n. 1.

[19] Several Courts of Appeals have held that a "continuing series" consists of three or more violations. See, *e. g., United States* v. *Sterling,* 742 F. 2d 521, 526 (CA9 1984); *United States* v. *Sinito,* 723 F. 2d 1250, 1261 (CA6 1983), cert. denied, 469 U. S. 817 (1984); *United States* v. *Chagra,* 653 F. 2d 26, 27–28 (CA1 1981), cert. denied, 455 U. S. 907 (1982).

[20] In fact, the United States plainly concedes as much:

"Petitioner does not dispute that the CCE prosecution could be maintained if predicated on a series of Title 21 violations for which he had not previously been prosecuted, and the proof at trial showed many such viola-

ment did not raise any double jeopardy problem because it did not rely on the Neah Bay importation and, indeed, did not separately charge any of the three earlier importations as substantive violations. Evidence of those felonies was offered to establish the greater CCE offense rather than separate, lesser offenses.

A double jeopardy issue was, however, created because the Government did not limit its proof to the three earlier importations. Instead, it offered extensive and dramatic evidence concerning the Neah Bay importation. Moreover, the jury was expressly instructed that the evidence concerning the *Sun Chaser III* "can only be considered by you in your deliberations concerning Count 11 of the indictment, which is the so called continuing criminal enterprise count, that's the allegation that Jonathan Garrett was engaged in, a continuing criminal enterprise."[21]

It therefore seems clear to me that even though the indictment properly alleged a CCE violation predicated only on the three earlier importations, as the case was actually tried, and as the jury was instructed, it is highly likely that the CCE conviction rested on the Neah Bay evidence and not merely on the earlier transactions. The error, in my opinion, does not bar a retrial on the CCE count. But I think that it is perfectly clear that the CCE conviction cannot stand because

___

tions. *The Washington offense was therefore by no means indispensable to establishment of the CCE offense . . . ."* Brief for United States 5 (emphasis added).

Moreover, the United States later states that "the substantive Washington offense was not an essential part of the government's proof on the CCE count" and that "in this case the Washington offense is not a necessary predicate for the CCE violation." *Id.*, at 10, n. 3. I also note that the fact that the Government might have proved a CCE by relying on felonies A, B, C, and D, or perhaps B, C, and D, would not prevent it from relying just on A, B, and C.

[21] 9 Record 18–19. Petitioner pleaded guilty to importation of marihuana in Washington; the District Court in Florida specifically instructed the jury that "[i]mportation of marijuana into the United States is another Title 21 offense you may consider." 14 Record 19.

the instructions on the CCE count did not inform the jury that the Neah Bay incident could not constitute a predicate felony to the CCE charge.[22]

It is also clear that the exception identified in *Brown* v. *Ohio,* 432 U. S. 161 (1977), is not applicable to this case. All of the facts necessary to sustain the CCE charge in the Florida indictment occurred before the Washington indictment was returned. Moreover, the Government has not claimed that the evidence necessary to sustain the CCE charge in the Florida indictment was not discovered until after the Washington conviction.[23] Indeed, if one compares the indictments, and if one assumes that the Government was prepared to prove what it alleged in the Florida indictment, the Neah Bay evidence was not needed in order to sustain the

---

[22] There is no need to reach the question whether the Neah Bay evidence may have been admissible for a limited purpose because no instructions regarding a limited use were given.

[23] This is plainly indicated by the Government at a bail hearing in Washington, where the prosecutor stated the following:

"Your Honor, the investigation by the grand jury in this district and the investigation which is being coordinated from the Narcotics Section in Washington, D. C., indicates that between 1977 and 1980 Mr. Garrett was involved in about four or five mother boat operations. *The Department of Justice had originally authorized this district to present a continuing criminal enterprise count to the grand jury.*

"*I can represent as an officer of the court that I think there was probable cause to believe he had been responsible for a continuing criminal enterprise and the grand jury would have returned an indictment.*" Tr. CR81–62M, pp. 6–7 (Apr. 8, 1981) (emphasis added).

The Government now agrees that it "does appear that all of the elements required for a CCE charge had occurred at the time of petitioner's prosecution in Washington." Brief for United States 44. However, it "advises" us, contrarily, that "the CCE investigation had not yet been completed and the case had not yet been presented to the grand jury." *Ibid.* More disturbing, the Government offers the outside-the-record, unsworn submission that the Justice Department "had not authorized a CCE charge in Washington" and that "the Assistant United States Attorney now acknowledges that such authority was never granted and that his statement to the contrary was in error." *Id.,* at 44, n. 36.

CCE charge.[24]   The record discloses no basis for applying the exception identified in *Brown* to this case.

## III

The Court's reasons for not applying the general rule to this case are somewhat unclear.   It seems to place its entire reliance on the fact that the CCE charge alleges that the enterprise continued to the date of the Florida indictment on July 16, 1981, together with the fact that when petitioner was arrested a week later, he made some damaging admissions.[25] Neither of these considerations has any constitutional significance that I can discern.   Further, although I did not subscribe to the analysis in the plurality opinion in *Jeffers* v. *United States*, 432 U. S. 137 (1977), I had thought every Member of the Court endorsed this proposition: "What lies at the heart of the Double Jeopardy Clause is the prohibition against multiple prosecutions for the 'the same offense.'   See *United States* v. *Wilson*, 420 U. S. 332, 343 (1975)."[26]   In my opinion it is far more important to vindicate that constitutional principle than to create a new doctrine in order to avoid the risk that a retrial may result in freeing this petitioner after only 19 years of imprisonment.[27]

I respectfully dissent.

---

[24] See n. 20, *supra.*

[25] See *ante*, at 791–792.

[26] 432 U. S., at 150.

[27] As the Court points out, *ante*, at 775, 777, the petitioner's 40-year sentence on the CCE count was concurrent to the consecutive sentences of 5 years for the Washington conviction and 14 years for the three Florida convictions.